Municipal Court of East Liverpool.

STATE OF OHIO V. POLONSKY.

Decided April 25, 1932.

G. J. *Clark*, City Solicitor, on behalf of State.

W. S. *Foulks* and B. H. *Cochran*, on behalf of defendant.

BROKAW, J.

In this case the defendant, Abe Polonsky, a fish and oyster dealer in the city of East Liverpool, Ohio, was arrested for selling oysters claimed to be adulterated within the meaning of the state law. The affidavit was filed by W. T. Ferrall, an Inspector working in the Pure Food Division of the State Department of Agriculture.

The affidavit is as follows: "W. T. Ferrall, an inspector of the Department of Agriculture of Ohio, being first duly cautioned and sworn, deposeth and saith that Abe Polonsky on or about the 21st day of January, A. D. 1932, at the city of East Liverpool, county of Columbiana, state of Ohio, did then and there unlawfully sell unto the said W. T. Ferrall, then and there being, a certain quantity of human food, purporting, appearing and represented by the said Abe Polonsky, to be oysters, which said oysters, so sold as aforesaid, were then and there adulterated in this, to-wit that the said oysters had mixed with them some other substance or substances causing an excess of exterior liquor so as to lower or depreciate or injuriously affect their quality, strength and purity, contrary to the statute in such case made and provided and against the peace and dignity of the state of Ohio."

The evidence shows that the affiant, W. T. Ferrall, on or about the 19th day of January, 1932, went into the defendant's shop in the city of East Liverpool, made known his identity and asked for a sample of oysters on sale by the defendant. The defendant went to the basement of his establishment, procured a gallon can of oysters from an original shipment and opened them in the presence of the inspector. The oysters in the large container were stirred and enough taken out to fill a pint jar. The contents of the jar were later analyzed by a chemist in the employ of the Pure Food Department at Columbus. The results of the analysis showed a solid content of 10.67%.

It is not contended by the prosecution that the defend-

ant himself adulterated the oysters or in fact did anything at all to them, except sell to the state officer for the purpose of analysis. It is the contention of the prosecution that the sale of oysters, with a solid content of less than 14%, is an infraction of the state law and that the analysis showing less than 14% solids of any sample proves an infraction of the law.

Section 5778, General Code, defines adulteration as follows:

"Food, drink, confectionery or condiments are adulterated within the meaning of this chapter: (1) if any substance or substances have been mixed with it, so as to lower or depreciate or injuriously affect its quality, strength or purity."

Further provisions of the same statute follows, but part one is the only provision relied upon.

Section 12758, General Code, furnishes the penalty for infractions.

The Legislature has given authority to the Secretary of Agriculture of the state of Ohio to establish standards of quality, strength and purity for foods. See Section 1177-12, General Code, which reads as follows:

"Adoption of standards and enforcement of laws; inspections and prosecutions. The Secretary of Agriculture shall establish standards of quality, purity and strength of foods, when such standards are not otherwise established by any law of this state. Such standard shall conform to the standards for foods adopted by the United States department of Agriculture."

In conformity with said Section 1177-12, General Code, the Secretary of Agriculture has established the following, which is offered in evidence as a standard to be used in the sale of oysters within the state of Ohio, found on page 13 of the Sanitary Regulations and Standards of the Department of Agriculture and is Section 11. It reads as follows:

"Analyses made of oysters as usually sold on the market, give the general average of water at less than 86 per cent., and the solids at more than 14 per cent. The department now rules that when oysters contain less than 14 per cent. of solids, it is a clear evidence of added water,

making prosecution necessary. Therefore, jobbers and retailers are hereby instructed not to accept from the packers shucked oysters to which ice or water has been added, and retailers are advised not to add ice to oysters, or to dilute them with water, under penalty of Section 5778, General Code."

The claim of the prosecution is based upon this standard, and it is maintained that the failure of any oysters, sold or offered for sale within the state of Ohio, to come up to the 14 per cent. solid content called for therein, is an adulteration within the meaning of the law.

First we will consider Section 11 of the Sanitary Code of the Department of Agriculture, and determine whether or not it provides as intended a standard for solid content of oysters. The language of the first section is as follows:

"Analyses made of oysters as usually sold on the market, give the general average of water at less than 86 per cent., and the solids at more than 14 per cent."

Is this the establishment of a standard or simply the recital of a custom? If we examine the various standards established by the Ohio State Legislature we find in every instance this and more particular language used.

Let us examine the language of the Legislature in establishing standards. For example, Section 6405, General Code. "The unit of standard measure of length and surface, from which all other measures of extension, whether lineal, superficial or solid, shall be derived and ascertained, is the standard yard, in possession of the secretary of state, and furnished by the government of the United States. The yard shall be divided into three equal parts, called feet, and etc."

Section 6406, General Code. "The rod, pole or perch shall contain five and a half such yards."

Section 6407, General Code. "The acre for land measure shall be measured horizontally, and contain ten square chains."

In these and innumerable other instances decisive language is used. It is not the contention of this court that it is necessary to use the word shall, but it does seem

necessary that some definite language be used providing that the solid contents of oysters be 14 per cent. rather than simply the recital of a custom.

Let us examine the further provisions of this section of the Department's code. The following language continues: "The department now rules that when oysters contain less than 14 per cent. of solids, it is clear evidence of added water, making prosecution necessary." This seems to the court to be simply a rule of evidence for the guidance of the department of inspectors. It certainly cannot be contended that the Legislature has given the department of agriculture power to establish rules of evidence binding upon the courts.

The further provision of the section is as follows: "Therefore, jobbers and retailers are hereby instructed not to accept from the packers shucked oysters to which ice or water has been added, and retailers are advised not to add ice to oysters, or to dilute them with water, under penalty of Section 5778, General Code." This seems to be simply good advice offered to those in the oyster trade. The court does not consider that the language of this section lays down an arbitrary standard that is binding upon the oyster business of the state.

The court is asked to rule that simply because the solid contents of the oysters analyzed fall below 14 per cent. that water has been added. In the opinion of the court this does not necessarily follow.

Section 1177-12, of General Code, which empowers the Secretary of Agriculture to establish standards provides that such standards shall conform to the standards for foods adopted by the United States Department of Agriculture, and it further provides that such rules and regulations shall, where applicable, conform to and be the same as the rules and regulations adopted from time to time for the enforcement of the Act of Congress, approved June 30, 1906, and amended March 3, 1913, and known as "the food and drug act."

No arbitrary standard has been provided by the United States Department, yet the matter of solid content of oysters has been enforced by the department through methods

of inspection; and evidence was offered in this hearing that the oysters in question had been legally inspected by the United States Government and passed before being shipped to the defendant herein. It is the contention of the prosecution that since no arbitrary standard has been set up by the Federal Government, the state department is at liberty to proceed and establish the standard. In the opinion of the court the establishment of an arbitrary standard runs counter to the policy and procedure of the government, if not to the absolute wording of the law.

It is a well known fact that oysters collected from different sources show a widely varying range of solid contents. The government's book known as "Bacteriology and Chemistry of Oysters" was offered in evidence at the hearing. In that booklet on page 5, last paragraph we find the following language: "Maximum, minimum, and average figures from the very large number of analyses made by the Bureau of Chemistry show the range of solids, ash, and salt in oysters from known sources."

Table 4 on page 6 gives the maximum, minimum, and average solid content of oysters from many sources. The figures offered in the table for washed oysters from the Chesapeake Bay District are: "Maximum solid content 16.47%; minimum 9.98%; average 13%." So it will be seen by the government's figures that the average solid content of oysters from the Chesapeake Bay District is one point less than the standard set up by the Ohio Department. Examination of this table in the Government's Bulletin shows that the solid content of Chesapeake Bay oysters is less than that of any other locality shown. Practically all oysters offered in markets in the state of Ohio are washed oysters. It has been found necessary to put them through some method of washing in order to remove dirt, shells and foreign matter. The washing invariably lowers the solid content and increases the water. Oysters may be adulterated through the washing process. They may be adulterated by the melting of ice, if ice is placed in direct contact with the oysters, and they may be so adulterated as to be an infraction of the provisions of the Federal Food Act; but it was not shown in this

hearing that any water was so added to the oysters in question.

Section 1177-12, General Code, above referred to provides that the rules and regulations given out by the secretary of agriculture of the state shall, where applicable, conform to and be the same as the rules and regulations adopted from time to time for the enforcement of the Act of Congress, approved June 30, 1906, and amended March 3, 1913, and known as "the food and drug act."

The standard, providing for the solid content of oysters, given out by the department, is placed before the court in a book called "Sanitary Regulations and Standards of the Department of Agriculture."

The United States Department of Agriculture has issued "Technical Bulletin No. 64. Bacteriology and Chemistry of Oysters, with special reference to Regulatory Control of Production, Handling, and Shipment." So both the state and the Federal Government have provided regulations upon this subject.

In the Federal Bulletin referred to the maximum, minimum and average figures from a large number of analyses made by the bureau of chemistry show the range of solids, and the table above referred to on page 6 shows that the minimum solid content may fall as low as 9.98%, and on page 8 of the same booklet it says that the minimum figure may not be absolutely the lowest.

It seems to the court that the regulations established by the state and federal government are contradictory in this respect, and it indicates to the court that the solid content may come much below 14% and much below the content shown even in the analyses in this case, without proving an adulteration. In view of the language regarding conformity of the regulations of the state and federal government, we believe that the state standard should be made to harmonize more fully with the findings of the federal department. We do not believe that an infraction of the law has been shown in this case and the action will be dismissed.